IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

LIBERTY INSURANCE CORPORATION,
    Plaintiff,

v().                                                                        Civil No. 3:18cv407 (DJN)

"TLB," a minor, *et al.*,
    Defendants.

## MEMORANDUM OPINION

Plaintiff Liberty Insurance Corporation ("Liberty") brings this action seeking a declaration that it does not have an obligation to indemnify Defendant James A. Hayden ("Hayden") or to make payments to Defendant TLB ("TLB") arising from a default judgment obtained by TLB against Hayden in an earlier personal injury action. This matter comes before the Court on Liberty's Motion for Summary Judgment, arguing that the policy at issue did not cover Hayden, because he did not constitute a member of the insured's household at the time of the occurrence. Defendants have failed to put forth admissible evidence that raises a genuine issue of material fact that would prevent a reasonable factfinder from returning a verdict in Liberty's favor. Consequently, for the reasons set forth below, the Court hereby GRANTS Liberty's Motion for Summary Judgment (ECF No. 39).

## I. Factual Background[1]

This action arises out of a dog bite that occurred at a property subject to a homeowner's insurance policy (the "Policy" (ECF No. 40-1)) issued by Liberty.

### A. The Policy.

Liberty issued the Policy to Sharon Wheeler ("Wheeler"), identifying Wheeler as the "insured" and "951 Swan Lane, Ruther Glen VA 22546-1206" (the "Swan Lane House") as the "Insured Location." (Policy at 4.[2]) With respect to personal liability, the Policy provided:

> If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" cause by an "occurrence" to which the coverage applies, we will . . . pay up to our limit of liability for the damages for which the "insured" is legally liable. . . .

(Policy at 19.) The policy provided for a coverage limit of $500,000. (Policy at 4.) Further, the Policy covered certain medical expenses incurred by others:

> We will pay the necessary medical expenses that are incurred or medically ascertained within three years of the date of an accident causing "bodily injury." . . . [T]his coverage applies only:
> 1.    To a person on the "insured location" with the permission of an "insured" . . . .

(Policy at 19.)

---

[1] Pursuant to Local Rule 56(B), Liberty included a section listing all undisputed material facts. (Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 40) at 2-9.) When ruling on a motion for summary judgment, "the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." E.D. Va. Loc. R. 56(B). The response filed by TLB's guardian *ad litem* indicated that TLB and her custodian have absented themselves from these proceedings. (Def.'s Resp. and Inc. Mem. in Supp. by Guard. ad Litem ("Def.'s Mem.") (ECF No. 41) at 2.) The response did not dispute any of Liberty's material facts and admitted that "the guardian *ad litem* has no information that contradicts information contained in the motion for summary judgment or attendant exhibits." (Def.'s Mem. at 2-3.) Accordingly, the Court accepts Liberty's facts as admitted.

[2] The Policy filed by Liberty as a single exhibit includes several different documents, including a declarations page, the policy itself and endorsements, each with their own pagination. (ECF No. 40-1.) For ease of reference, the Court will consider all of these exhibits as the Policy and will refer to the pagination on the document as stamped by the Court's ECF system.

The Policy defines "insured" as "you and residents of your household who are . . . [y]our relatives; or [o]ther persons under the age of 21 and in the care of any named person above." (Policy at 9.) "You" and "your," in turn, refer to the "'named insured' shown in the Declarations and the spouse if a resident of the same household." (Policy at 9.)

**B.   Wheeler's Purchase and Use of the Swan Lane House.**

Wheeler and her current husband, Daniel Lee Wheeler, had lived together at 5907 Vista Court in Fredericksburg, Virginia (the "Vista Court House") for the duration of their 17-year marriage. (Dep. Tr. of Sharon Wheeler, May 25, 2017 ("Wheeler Dep.") (ECF No. 40-2) at 5:14-6:2.) At some point in 2013, Wheeler and her husband began experiencing marital difficulties. (Wheeler Dep. 8:4-11:17.) Wheeler occasionally stayed overnight with friends, taking only her clothes with her. (Wheeler Dep. 8:4-11:17.) Because of these marital problems, Wheeler purchased the Swan Lane House, closing the sale on October 18, 2013. (Wheeler Dep. 8:4-11:17.) By the time of the closing, Wheeler and her husband had begun discussions regarding reconciliation and the possibility of continuing to live together. (Wheeler Dep. 17:19-18:8.) Neither Wheeler nor her husband had filed for legal separation, nor had she contacted a lawyer. (Wheeler Dep. 38:19-23.)

Following the closing on the Swan Lane House, Wheeler stayed there every night for a week, from October 19, 2013 to October 26, 2013. (Wheeler Dep. 18:19-19:12.) Wheeler had not yet determined whether she would reside at the Swan Lane House permanently or return to the Vista Court House to live with her husband. (Wheeler Dep. 22:25-23:8.) Wheeler brought some of her clothes with her to the Swan Lane House and purchased some dishes, utensils, sheets and towels, which she left at the Swan Lane House after the week. (Wheeler Dep. 20:7-12.) She also purchased a sofa that remained there. (Wheeler Dep. 29:11-23.)

3

After a week of staying at the Swan Lane House, Wheeler reconciled with her husband and returned to the Vista Court House. (Wheeler Dep. 19:9-12, 27:11-19.) She left the kitchen items and furniture at the Swan Lane House, but she did not leave any personal belongings there. (Wheeler Dep. 29:4-23, 39:5-12, 46:14-47:5, 60:8-21.) After that week, she did not maintain a bedroom or keep any property at the Swan Lane House. (Wheeler Dep. 30:17-31:4.)

Wheeler never changed her address from the Vista Court House to the Swan Lane House on her driver's license, vehicle registration or employment records. (Wheeler Dep. 21:21-22:20.) At all times, she received mail at a post office box and only received utility bills and junk mail at the Swan Lane House. (Wheeler Dep. 22:2-8, 29:24-30:16.)

## C. Hayden and His Use of the Vista Court House and the Swan Lane House.

Hayden, Wheeler's son from a previous marriage, was 21 years old when Wheeler married her current husband. (Wheeler Dep. 6:5-13.) Hayden never resided at the Vista Court House with Wheeler and her husband. (Wheeler Dep. 6:6-7:25, 31:5-32:4.) Hayden did not have a room or private space at the Vista Court House, did not do any chores there, did not contribute to any household expenses there, did not receive any mail there and has never paid rent there. (Wheeler Dep. 6:6-7:25, 31:5-32:4.) Indeed, Wheeler, her husband, and Hayden have never lived together. (Wheeler Dep. 6:6-7:25, 31:5-32:4.)

In 2013, Hayden, then 35, separated from his wife and moved out of the house that they shared at 808 Lake Caroline Drive. (Wheeler Dep. 17:9-18, 23:9-14.) When Wheeler closed on the Swan Lane House, she asked Hayden to stay there. (Wheeler Dep. 11:13-24, 18:9-19:12, 23:9-14.) Hayden went to stay at the Swan Lane House at approximately the same time as Wheeler. (Wheeler Dep. 18:19-23.) When Hayden first arrived, he brought only his clothes and his pet pit bull, "Junior," leaving the rest of his belongings in storage. (Dep. Tr. of James

4

Hayden, May 25, 2017 ("Hayden Dep.") (ECF No. 40-3) at 14:9-15:16, 21:7-16, 24:7-25:2.) At the time, he intended to reconcile with his wife. (Hayden Dep. 16:16-17:22, 18:11-19:2, 20:18-21:6.) When Hayden separated from his wife in August 2013, neither had retained a lawyer or filed for divorce. (Hayden Dep. 115:17-22.)

Hayden did not change his address to the Swan Lane House until sometime in 2014. (Hayden Dep. 22:19-23:20.) He did not receive mail at the Swan Lane House until sometime in 2014. (Hayden Dep. 63:1-12.)

During the one week in October 2013 that both Wheeler and Hayden stayed at the Swan Lane House, they did not share meals together, interact socially or share any mutual interests. (Wheeler Dep. 28:2-19:3, 36:23-37:1.) They did not have any joint bank accounts or credit cards, and Hayden did not depend financially on Wheeler. (Wheeler Dep. 24:12-13, 61:13-19.) They each maintained their own health and auto insurance. (Wheeler Dep. 23:15-24:8.)

After Wheeler returned to the Vista Court House, Hayden remained at the Swan Lane House. (Wheeler Dep. 25:18-26:8, 45:9-14.) Hayden began paying Wheeler money for the monthly mortgage payments and continued to do so until suffering an injury in a motorcycle accident in 2014. (Wheeler Dep. 25:18-26:8, 45:9-14.) Hayden also took on a roommate who contributed to the rent. (Hayden Dep. 25:9-23.) Wheeler and the roommate never lived at the Swan Lane House at the same time. (Hayden Dep. 31:4-14.)

**D.      The Dog Bite.**

On November 5, 2013, Hayden's roommate and several acquaintances, including 15 month-old TLB and her mother, were at the Swan Lane House. (Hayden Dep. 35:16-37:15, 39:15-18.) Junior the dog bit TLB. (Hayden Dep. 60:14-16.) Junior belonged to Hayden, and Wheeler did not own Junior or any other dogs at the time. (Wheeler Dep. 32:6-14.)

5

Wheeler had never met or spoken to TLB or TLB's mother. (Wheeler Dep. 47:23-24, 49:6-11.) Generally, Wheeler did not like Hayden's friends or approve of them coming to the Swan Lane House. (Wheeler Dep. 41:9-18, 61:1-12.) Wheeler was not present at the time of the incident, having already moved back to the Vista Court House with her husband. (Wheeler Dep. 32:17-21, 33:6-9, 47:6-12.)

TLB subsequently brought a state court suit (the "Underlying Lawsuit") against Hayden in the Caroline County Circuit Court, alleging that she had suffered serious and permanent injuries as a result of the incident. (Hayden Dep. 58:23-60:5; (ECF No. 1-1).) On July 10, 2015, the Caroline County Circuit Court entered a default judgment against Hayden, which Hayden had signed. (Hayden Dep. 53:1-19; (ECF No. 1-2).) The Circuit Court found that Hayden had waived any right to defend the merits of the Underlying Lawsuit, and it subsequently entered judgment in TLB's favor in the amount of $500,000. (Hayden Dep. 53:1-19; Ex. 1 to Hayden Dep. Tr.)

### E.  Procedural History.

On July 12, 2018, Liberty filed the Complaint for a declaratory judgment, seeking a declaration that the policy did not obligate it to indemnify Hayden for the default judgment entered in favor of TLB. (ECF No. 1.) Hayden failed to respond, and the Clerk entered default as to him on August 16, 2018. (ECF No. 16.) On September 10, 2018, the Court appointed a guardian *ad litem* for TLB. (ECF No. 17.) On November 20, 2019, Liberty filed the instant Motion for Summary Judgment, arguing that the Policy did not cover Hayden. (ECF No. 39.) On January 1, 2020, the TLB's guardian *ad litem* filed a response. (ECF No. 41.) On January 9, 2020, Liberty filed a reply brief. (ECF No. 42.) The matter is now ripe for review.

## II. STANDARD OF REVIEW

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should occur "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry in a summary judgment analysis focuses on "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In reviewing a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party. *Id.* at 255. Moreover, the Court cannot weigh the evidence to enter a judgment, but simply must determine whether a genuine issue for trial exists. *Greater Balt. Ctr. for Pregnancy Concerns v. Mayor of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013) (quoting *Anderson*, 477 U.S. at 249).

Once the moving party properly submits and supports a motion for summary judgment, the opposing party bears the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; instead, there must be no genuine issue of material fact. *Anderson*, 477 U.S. at 247-48. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

Indeed, the Court must grant summary judgment if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986). To defeat an otherwise properly supported motion for summary judgment, the non-moving party "must rely on more than conclusory allegations, 'mere speculation,' the 'building of one inference upon another,' the 'mere existence of a scintilla of evidence,' or the appearance of some 'metaphysical doubt' concerning a material fact." *Lewis v. City of Va. Beach Sheriff's Office*, 409 F. Supp. 2d 696, 704 (E.D. Va. 2006) (citations omitted). A "genuine" issue concerning a "material" fact only arises when the evidence, viewed in the light most favorable to the non-moving party, allows a reasonable factfinder to return a verdict in that party's favor. *Anderson*, 477 U.S. at 248.

If a party fails to address the other party's assertion of fact, the Court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P 56(e)(2). Further, Rule 56 provides that the Court may "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

### III. DISCUSSION

Liberty argues that it does not have an obligation to indemnify Hayden for the default judgment, because the Policy provides no coverage for Hayden. (Pl.'s Mem. at 1.) Specifically, Liberty argues that the Policy did not identify Hayden as a named insured, nor did the Policy insure Hayden as a "resident of Wheeler's household." (Pl.'s Mem. at 12.) As the Policy clearly does not name Hayden as an insured, coverage turns on whether Hayden qualified as a resident of Wheeler's household at the time of the dog bite incident.[3]

---

[3] For the purposes of determining whether a person qualified as a resident of a named insured's household, courts focus on the person's status at the time of the incident giving rise to the loss. *See, e.g., Travelers Pers. Sec. Ins. Co. v. Johnston*, 2017 WL 1337305, at *6 (W.D. Va. Apr. 11, 2017) ("Gribbin's statement, then, cannot establish that Riddle was a resident of the

8

Under Virginia law, the phrase "resident of the same household" involves more than simply living under the same roof. The Supreme Court of Virginia has stated that "[t]he word 'household' connotes a settled status; a more settled or permanent status is indicated by 'resident of the same household' than would be indicated by 'resident of the same house or apartment.'" *USAA Cas. Ins. Co. v. Hensley*, 465 S.E.2d 791, 793-94 (Va. 1996) (quoting *Allstate Ins. Co. v. Patterson*, 344 S.E.2d 890, 892 (Va. 1986)). Indeed:

> Whether the term "household" or "family" is used, the term embraces a collection of persons as a single group, with one head, living together, a unit of permanent and domestic character, under one roof; a "collective body of persons living together within one curtilage, subsisting in common and directing their attention to a common object, the promotion of their mutual interests and social happiness."

*Id.* Although a person's intent to become a member of a particular household informs the analysis, "conduct can belie intent." *State Farm Fire and Casualty Co. v. Ponzi*, 2019 WL 7040927, at *3 (E.D. Va. Dec. 20, 2019) (citing *Patterson*, 344 S.E.2d at 893).

Here, the Court finds that Wheeler's household during the relevant time period remained the Vista Court House. Although she purchased the Swan Lane House, she stayed there for only one week. During that week, the majority of her personal items remained at the Vista Court House. She never changed her address to the Swan Lane House with the DMV, the post office or her employer. And by the time she closed on the Swan Lane House, she had already contemplated reconciling with her husband and remaining at the Vista Court House. Indeed, neither had filed for legal separation nor contacted a lawyer.

No evidence even suggests that Hayden joined Wheeler's household at the Vista Court House, or even ever intended to join that household. Hayden never resided at the Vista Court House with Wheeler and her husband. Nor did he have a room there, handle any chores there,

---

household *at the time of the Accident*, which is the legally relevant question here." (emphasis in original)).

9

contribute to the household expenses or receive mail there. Accordingly, Hayden did not qualify as a member of Wheeler's household at the Vista Court House.

Moreover, even if Wheeler's household became the Swan Lane House during the week that she lived there, Hayden still did not constitute a "resident of [Wheeler's] household" at the time of the incident. Hayden did not intend to stay there indefinitely, as he intended to reconcile with his wife. Hayden maintained minimal contacts with Wheeler and no contacts with Wheeler's husband. They did not share acquaintances, hobbies or mutual interests. Wheeler and Hayden shared no bank accounts or credit cards, and each maintained their own insurance. By all accounts, Hayden did not form any intention to permanently reside at the Swan Lane House — much less to become a member of Wheeler's Household — until sometime in 2014, after the incident at issue. Rather, at the time of the incident, Wheeler and Hayden lived in different houses, with Hayden having no more than casual, erratic contacts with Wheeler's household. This fails to establish Hayden's membership in Wheeler's household. *See Bryant v. State Farm Fire and Cas. Co.*, 2017 WL 2266914, at *5 (W.D. Va. May 23, 2017) (finding that an adult son living in a house owned by his father did not constitute a member of the father's household for purposes of determining whether the father's homeowner's insurance policy had to indemnify the son in an underlying personal injury suit arising from a dog bite incident at the son's house). Accordingly, Hayden did not qualify as an insured under the Policy at the time of the dog bite incident.

Finally, Liberty argues that the "Medical Payment to Others" provision of the Policy does not apply. (Pl.'s Mem. at 20.) The Court agrees. The provision applies to accidents involving "a person on the 'insured location' with the permission of an 'insured' . . . ." (Policy at. 19.) Thus, if TLB received her injuries from the dog bite while at the Swan Lane House with the

permission of an insured — Wheeler or her husband — then the Policy could apply to certain of her medical payments. However, the evidence does not demonstrate that Wheeler granted such permission. Wheeler had moved out of the Swan Lane House by the time of the incident and was not present that night. Indeed, Wheeler had never met or spoken to TLB or TLB's mother. Generally, Wheeler did not like Hayden's friends or approve of them visiting the Swan Lane House. No evidence exists that TLB or anyone other than Hayden had Wheeler's permission to be on the premises at the time of the incident. Accordingly, like the "Personal Liability" provision of the Policy, the Court finds that the "Medical Payments to Others" provision in the Policy does not apply.

### IV. CONCLUSION

For the reasons stated above, the Court hereby GRANTS Liberty's Motion for Summary Judgment (ECF No. 39). As a result, Liberty is entitled to a declaratory judgment that it owes no duty to provide any insurance coverage under the Policy to Hayden with respect to any claims against him arising from the dog bite incident on November 5, 2013.

An appropriate Order will issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

/s/
David J. Novak
United States District Judge

Richmond, Virginia
Dated: January 14, 2020